**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MELISSA LOEFFELHOLZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:14CV01158 ERW |
| | ) | |
| ASCENSION HEALTH, INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on Plaintiff Melissa Loeffelholz's "Dispositive Motion for Final Summary Judgment" [ECF No. 52] and Defendant Ascension Health's "Motion for Summary Judgment [ECF No. 54].

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Introduction and Terms of "the Plan"*

This case arises out of the denial of long-term disability "buy-up" benefits to Plaintiff Melissa Loeffelholz.  The following is a recitation of facts determined to be undisputed based on "Plaintiff's Statement of Uncontroverted Material Facts in Support of Plaintiff's Dispositive Motion for Final Summary Judgment" [ECF No. 53], Defendant Ascension Health's "Response to Plaintiff's Statement of Uncontroverted Facts" [ECF No. 63], and Defendant's "Statement of Uncontroverted Material Facts in Support of Motion for Summary Judgment" [ECF No. 56].[1]

---

[1] Federal Rule of Civil Procedure 56(c)(1) states:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> >     (A) citing to particular parts of materials in the record . . .; or

Plaintiff filed suit pursuant to the Employee Retirement Income Security Act ("ERISA"), seeking payment of long-term disability ("LTD") "buy-up" benefits under the Ascension Long-Term Disability Plan ("the Plan"). At all times relevant, Defendant acted as sponsor and administrator of the Plan, which is governed by ERISA, for the benefit of eligible employees of St. Vincent's Medical Center ("St. Vincent's") in Jacksonville, Florida. Under the Plan, a "determination as to whether a Participant is eligible for a long-term Disability Benefit shall be made as of the last day the Participant was Actively at Work" [ECF No. 30 at 30].

The Plan gives the administrator "discretionary authority to decide all questions arising in connection with the administration, interpretation and application of the Plan" [ECF No. 30 at 21]. The Plan also gives Defendant power to delegate its authority to other administrators, and pursuant to that power, Defendant delegated its discretionary authority regarding claims administration to Sedgwick Claims Management Services ("Sedgwick"). Sedgwick was

---

   (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Relatedly, Rule 56(e) states, "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]" Here, Plaintiff did not file a response to Defendant's Statement of Uncontroverted Material Facts, and Plaintiff's "Response in Opposition to Defendant's Motion for Summary Judgment" [ECF No. 61], the substance of which consists of one paragraph, fails to cite to any portion of the Administrative Record and lacks any specific disagreement with any material fact asserted by Defendant. Rather, after conceding this Court should use the "arbitrary and capricious" standard of review and acknowledging, "as a general matter, buy[-]up benefits under the Plan are subject to the Plan's Pre-Existing Condition Exclusion," Plaintiff's Response simply states, "The Plaintiff disputes the remainder of Defendant's Motion for Summary Judgment, and disputes that the Plan's Pre-Existing Condition Exclusion bars Plaintiff's claim for buy[-]up benefits for the reasons more fully discussed in Plaintiff's Dispositive Motion for Summary Judgment" [ECF No. 61 at 1]. Therefore, pursuant to Rule 56(e), to the extent Plaintiff's Statement of Facts does not contradict Defendant's Statement of Facts (and to the extent the Court has not found facts stated by Defendant to be unsupported by the cited portions of the Administrative Record), this Court will consider Defendant's Statement of Facts to be undisputed for the purpose of ruling on these Motions.

Defendant's third-party claims administrator with respect to LTD claims at the time of the denial of benefits in this case.

The Plan allows employees to "buy-up" optional benefits if their employer makes this election in its Adoption Agreement. In its Adoption Agreement, St. Vincent elected to provide a Core Benefit of 50% of an employee's Basic Monthly Earnings and an Option Benefit of a 20% "buy-up," which increases an employee's benefit amount to 70% of Basic Monthly Earnings. The Plan explains to employees the Core Benefit paid by their employer is 50% of Basic Monthly Earnings and that they have the option of paying for a 20% "buy-up" to 70% of Basic Monthly Earnings.

The Plan, the Adoption Agreement, and the Summary Plan Description ("SPD")[2] all explain in similar language that the Plan does not cover Pre-Existing Conditions. For instance, the Adoption Agreement describes the "Pre-Existing Condition Exclusion" as follows:

> The plan does not provide benefits for any disability that is caused by, contributed to, or results from a Pre-existing Condition that was in existence within three (3) months before your effective date of coverage. The Pre-existing Condition Exclusion will not apply after you perform the Material Duties of your regular occupation for at least twelve (12) months following your effective date of coverage.
> If your Optional Benefit amount increases based on a change in elections, after initial eligibility the additional amount will be subject to the Pre-existing Condition Exclusion at the time the change in coverage becomes effective.

[ECF No. 30 at 96-97]. The Plan defines "Pre-Existing Condition" as "an Injury or Sickness or any related Injury or Sickness that was in existence within the three-month period ending on the day immediately before the date the Participant becomes covered under this Plan or the date any increased Benefit amount option becomes effective" [ECF No. 30 at 17]. Buy-up benefits under the Plan are subject to the Plan's Pre-Existing Condition Exclusion, and a Plan Participant is

---

[2] The SPD was provided to Plaintiff and other Plan Participants.

subject to the Plan's Pre-Existing Condition Exclusion if the Participant becomes disabled within twelve months of the effective date of coverage.

Plaintiff was previously employed by St. Vincent's as a Capital Campaign Coordinator. During her employment, Plaintiff selected optional buy-up coverage under the Plan effective January 1, 2012. Plaintiff stopped working on November 1, 2012. Because the Plan's Elimination Period is 180 days from the date of disability, the buy-up benefits would have been payable to Plaintiff as of April 30, 2013. The Plan provided Plaintiff with base LTD coverage, and Defendant approved Plaintiff for and paid Plaintiff the underlying base LTD benefit. However, Defendant denied Plaintiff's claim for buy-up benefits, claiming Plaintiff's disability was caused by a "Pre-Existing Condition" as defined by the Plan. Plaintiff appealed the denial of buy-up benefits and exhausted administrative remedies under the Plan.

**B.**     *Administrative Record Evidence*[3]

On September 14, 2012, Plaintiff was involved in a motor vehicle accident, in which her vehicle was struck by another vehicle traveling at approximately forty-five miles per hour. On October 17, 2012, Plaintiff saw her treating dentist, B. Keith Blankenship, DDS. Plaintiff was crying and reported severe pain, expressing a desire for the problem to be "taken care of immediately." Dr. Blankenship "explained to her that it has taken time to get to the point where she is today and it may take time for healing" [ECF No. 33 at 42]. Plaintiff again saw Dr. Blankenship on October 30, 2012, reporting severe pain. Dr. Blankenship instructed Plaintiff to wear a temporary orthotic he had fabricated, and he gave Plaintiff a permanent orthotic on

---

[3] The Court acknowledges Defendant's frequent use of the following phrase in responding to Plaintiff's Statement of Facts: "Defendant admits that the Administrative Record reflects that . . ." Because the Court's present task is merely to evaluate Sedgwick's decision based on the Administrative Record that was before it, Defendant's admissions as to what the record reflects are sufficient. Thus, the assertions in this section need not necessarily be understood as truth, but merely as a reflection of what is stated in the Administrative Record.

November 1, 2012, the day Plaintiff stopped working. In his attending physician statement, Dr. Blankenship stated Plaintiff "has a TMJ disorder[4] with severe symptoms" [ECF No. 31 at 45].

On November 5, 2012, Plaintiff told her treating oral surgeon, Dr. David Woods, she had a ten-year history of "clenching" and that her jaw had locked closed once a few years prior. On November 29, Plaintiff saw Dr. Blankenship for review of the orthotic he had prepared, and Dr. Blankenship again explained to Plaintiff it took time for healing. On December 4, 2012, Plaintiff's treating neurologist, Dr. Syed Asad, prepared an attending physician's statement, indicating his first visit with Plaintiff had been on October 9, 2012. Dr. Asad's primary diagnoisis was dizziness and giddiness, and the secondary diagnosis was visual disturbance. Dr. Asad indicated Plaintiff's anticipated return to work was December 10, 2012, but he also indicated Plaintiff's work restrictions were "unknown." On January 10, 2013, Plaintiff was seen for follow-up by a neurosurgeon, Dr. Rabin Tawk, who indicated Plaintiff had initially presented with headaches. At that visit, Dr. Tawk had a CT perfusion scan performed on Plaintiff. Plaintiff had undergone diagnostic cerebral testing on December 14, 2012, which was positive for Moyamoya syndrome.

On January 7, 2013, Plaintiff visited Temporomandibular Joint Disorder ("TMJ") specialist Dr. Mark Piper. Plaintiff's chief complaint was deep, burning, and aching pain in the right facial area. At the visit, Dr. Piper noted the following medical history:

> [Plaintiff] had orthodontic appliances from 1996 to 1999, and thereafter wore a night guard for temporomandibular joint problems between 2000 and 2010; on August 28, 2012, she experienced severe right-sided headaches with sharp ear pain, ear fullness, pressure, disequilibrium, and blurring in the right eye; by September 2, 2012, she noted an increase in symptoms; because her pain was becoming debilitating she went to the emergency room, where she was diagnosed with Eustachian tube dysfunction; on September 14, 2012, she was involved in a motor vehicle rear end collision; she was referred to a neurologist, and diagnosed

---

[4] The acronym "TMJ" refers to Temporomandibular Joint Disorder.

with migraine headaches; she was fitted with an occlusal guard and prescribed medication for Eustachian tube dysfunction; by October 25, 2012, she was getting severe ear pain, which was debilitating and made it impossible for her to work; she then consulted with a neuro-otologist, who did hearing testing and advised that the symptoms were caused by a temporomandibular joint problem;[5] the Plaintiff subsequently underwent insertion of a permanent orthotic and temporomandibular arthrocentesis of the right temporomandibular joint, which gave her two days of relief.

[ECF No. 53 at ¶ 19]. Dr. Piper further noted Plaintiff had been evaluated by a neurologist on November 14, 2012 for constant burning ear pain with migration into the shoulders, arms, and fingers. MRI imaging of the head evidenced vascular malformation of the right cerebral artery. At the January 7 visit, Dr. Piper described Plaintiff's trauma from the September 14 car accident as "remarkable," noting Plaintiff had suffered "whiplash injury," which required chiropractic treatment. At the same visit, Plaintiff told Dr. Piper she had "severe temporomandibular joint. I clench most of the time and clench and grind at night. My left back teeth do not touch without the orthotic. I have malocclusion and medial displaced right temporomandibular joint disc, muscle edema, and trace joint effusion" [ECF No. 35 at 20]. Subsequently, Dr. Piper obtained a new MRI scan, which verified both discs were medially dislocated. Dr. Piper diagnosed internal derangement of the temporomandibular joints.

In a hospital admission report, dated February 6, 2013, Dr. Piper stated he had reviewed CT scans with Plaintiff, which showed distortion of both temporomandibular joints consistent with disc displacement. Plaintiff also had a loss of the lordotic curvature in her cervical spine, and MRIs of the temporomandibular joint showed medial displacement of both discs. Damage on the right side was more severe than on the left side. The report also notes Dr. Piper diagnosed distal displacement bilaterally with partial distal locking and found Plaintiff had sympathetic

---

[5] Dr. Piper's exact phrasing on this point was as follows: "It was advised that this absolutely was a temporomandibular joint problem" [ECF No. 35 at 19]. Plaintiff's ear, nose, and throat doctor came to the same conclusion [*See* ECF No. 33 at 42].

nerve dysfunction on the right side of her face, referring her for a nerve block. Dr. Piper noted surgery could be considered as an option, concluding Plaintiff "has painful damage to her temporomandibular joints" and "has a long[-]standing problem in her temporomandibular joints, which may well predate her childhood orthodontic management" [ECF No. 35 at 28]. Dr. Piper also noted Plaintiff had Moyamoya malformation, which was "felt to have dated back to childhood" [ECF No. 35 at 28]. After Dr. Piper recommended Plaintiff undergo bilateral temporomandibular joint fat graft surgery and discectomy, Dr. Piper performed a bilateral temporomandibular joint microscopic arthroplasty with discectomy and placement of autologous fat graft, with application of maxillomandibular fixation with right stellate ganglion nerve block.[6]

On February 19, 2013, Dr. Piper prepared an attending physician's statement, which indicated Plaintiff was not totally disabled, but had work restrictions. Dr. Piper opined Plaintiff's primary diagnosis was meniscus dislocation. Because Plaintiff's jaw was banded shut with a splint for most of the day, Dr. Piper opined Plaintiff could not lift more than fifteen pounds and was limited to talking cumulatively for four hours in an eight-hour period. On May 7, 2013, Plaintiff underwent a CT scan and saw Dr. Piper for post-surgical follow-up. Based on the CT scan results, Dr. Piper allowed Plaintiff to engage in minimal functional chewing. Further, Dr. Piper recommended a repeat CT scan in three months.

On May 6, 2013, Dr. Asad prepared an attending physician's statement, indicating Plaintiff's "primary diagnosis" "was Moyamoya Disease." Dr. Asad indicated Plaintiff's condition did not disable her from her occupation or require physical restrictions on sitting, standing, walking, bending, stooping, crouching, crawling, kneeling, reaching overhead, or handling objects. However, Dr. Asad did acknowledge the speech restrictions imposed by Dr.

_____
[6] This procedure took place on February 6, 2013.

Piper and stated Plaintiff had ongoing severe anxiety that could restrict her ability to work.

On May 14, 2013, Dr. Piper prepared an attending physician statement, in which he opined Plaintiff was totally disabled from her occupation with a primary diagnosis of reflex sympathetic dystrophy ("RSD").[7] Dr. Piper opined Plaintiff could not function or drive on her medications, which included narcotics. Additionally, Dr. Piper stated: (1) Plaintiff had talking restrictions; (2) Plaintiff could not function due to the effects of medications; and (3) Plaintiff's return-to-work date was unknown at that time.

## C. *Claim History*

On November 14, 2012, Sedgwick acknowledged Plaintiff's claim for short-term disability ("STD") benefits. On January 9, 2013, Sedgwick approved Plaintiff's claim for STD benefits effective November 15, 2012. On April 9, 2013, Sedgwick acknowledged receipt of Plaintiff's claim for LTD benefits. On April 11, 2013, Sedgwick informed Plaintiff her LTD benefits claim had been approved, explaining the benefits would be paid under the LTD Plan beginning April 30, 2013 (i.e., after the 180-day elimination period following Plaintiff's initial disability on November 1, 2012). Accordingly, Plaintiff's gross monthly benefit was $2,520.27, which was 50% of her regular salary. Sedgwick informed Plaintiff the Pre-Existing Condition Exclusion applied to the buy-up portion of her benefit, explaining it was contacting her treating physicians to evaluate her buy-up claim. Subsequently, Sedgwick solicited updated information from Plaintiff's health care providers.

On May 9, 2013, M. Vargo, a registered nurse employed by Sedgwick, reviewed Plaintiff's medical records in connection with Plaintiff's claim for disability buy-up benefits.

---

[7] Stedman's Medical Dictionary (28th Edition) describes RSD, or Complex Regional Pain Syndrome, as "diffuse persistent pain usually in an extremity often associated with vasomotor disturbances, trophic changes, and limitation or immobility of joints; frequently follows some local injury."

Nurse Vargo indicated she reviewed the following records from the following doctors: Dr. Blankenship from October 17, 2012, through December 11, 2012; Dr. Woods from November 2, 2011, through November 28, 2012; Dr. Asad from July 24, 2012, through May 6, 2013; Dr. Piper from January 7, 2013, through February 19, 2013; and Dr. Tawk from December 6, 2012, through January 10, 2013. Nurse Vargo recommended a denial of buy-up benefits on the basis Plaintiff's Disability was caused by a Pre-Existing Condition that was in existence within three months of the LTD buy-up effective date of January 1, 2012. Vargo's reasoning was based (at least in part) on the following temporomandibular joint-related issues: Dr. Piper had noted Plaintiff had orthodontic appliances from 1996 to 1999 and thereafter wore a night guard for temporomandibular joint problems between 2000 and 2010, as well as the fact Plaintiff had significant bruxism on the splint, wearing it intermittently; Dr. Piper had indicated in February 2013 that Plaintiff had a long-standing problem with her temporomandibular joint that could have predated her childhood orthodontic management; Dr. Woods had indicated in 2012 that Plaintiff had a ten-year history of clenching and history of TMJ; Plaintiff hand indicated to Dr. Woods that her jaw had locked closed once a few years previously; and Dr. Blankenship stated on December 11, 2012 that "it has taken time to get to the point where she is today and it may take time for healing." On May 11, 2013, Sedgwick wrote Plaintiff, stating Sedgwick had determined Plaintiff did not qualify for the 20% buy-up portion of the Plan's LTD benefits because of the Pre-Existing Condition Exclusion. Sedgwick also advised Plaintiff of her right to appeal the determination within 180 days and provided a packet of information regarding appeal.

On June 17, 2013, Plaintiff appealed the denial of additional LTD buy-up benefits, claiming her condition was not pre-existing. Plaintiff asserted her disability was due to the healing process from her February 2013 surgery, which Plaintiff argued was a result of her

September 2012 car accident. Specifically, Plaintiff stated the reason she remained disabled was because she was on a very strict splint schedule, under which she was unable to talk for most of the day, and Plaintiff indicated she was still enduring post-operative pain, undergoing physical therapy three to four times per week, and receiving sympathetic nerve blocks.

On June 28, 2013, Sedgwick acknowledged Plaintiff's appeal. However, it upheld the denial of buy-up benefits on appeal, issuing a final administrative denial on July 30, 2013. Sedgwick's denial informed Plaintiff the Pre-Existing Condition Exclusion applied to her requested buy-up benefits; specifically, Plaintiff's buy-up became effective January 1, 2012, and the last day she was actively at work was within twelve months of that date (November 1, 2012). Based on its review of Plaintiff's medical records for dates covering October 17, 2012, through May 14, 2013, Sedgwick had determined Plaintiff's disability was caused by, contributed to, or resulted from her TMJ, which had existed for years prior to her disability.

## II.  SUMMARY JUDGMENT STANDARD

A court shall grant a motion for summary judgment only if the moving party shows "there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). By definition, material facts "might affect the outcome of the suit under the governing law," and a genuine dispute of material fact is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The moving party bears the initial burden of proof in establishing "the non-existence of any genuine issue of fact that is material to a judgment in his favor." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). The moving party must show that "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party must then set forth affirmative evidence and specific facts that demonstrate a genuine dispute on that issue. *Anderson*, 477 U.S. at 250. When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but, by affidavit and other evidence, must set forth specific facts showing that a genuine dispute of material fact exists. Fed. R. Civ. P. 56(c)(1); *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 465 (8th Cir. 2002). To meet its burden and survive summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the non-moving party must demonstrate sufficient favorable evidence that could enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

In ruling on a motion for summary judgment, the Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011). The Court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." *Id.* The Court must view the facts and all reasonable inferences in the light

most favorable to the nonmoving party. *Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009).

## III.    DISCUSSION

A denial of benefits challenged under § 1132(a)(1)(B) of ERISA is reviewed de novo, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When the ERISA plan grants the administrator discretion to construe the plan and to determine benefits eligibility, the Court must apply a deferential "abuse of discretion" standard in reviewing the plan administrator's decision. *Jessup v. Alcoa, Inc.*, 481 F.3d 1004, 1006 (8th Cir. 2007) (internal citation omitted). Under this abuse of discretion standard, the Court will "reverse the plan administrator's decision 'only if it is arbitrary and capricious.'" *Groves v. Metro. Life Ins. Co.*, 438 F.3d 872, 874 (8th Cir. 2006) (quoting *Hebert v. SBC Pension Benefit Plan*, 354 F.3d 796, 799 (8th Cir. 2004)).

To determine whether a plan administrator's decision was arbitrary and capricious, "we ask whether the decision to deny . . . benefits was supported by substantial evidence, meaning more than a scintilla but less than a preponderance." *Schatz v. Mut. Of Omaha Ins. Co.*, 220 F.3d 944, 949 (8th Cir. 2000); *see also Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997) (internal quotations and citation omitted) ("The proper inquiry under the deferential standard is whether the plan administrator's decision was reasonable; i.e. supported by substantial evidence."). "Provided the decision 'is supported by a reasonable explanation, it should not be disturbed, even though a different reasonable interpretation could have been made.'" *Schatz*, 220 F.3d at 949 (quoting *Cash*, 107 F.3d at 641). "The requirement that the [plan administrator's] decision be reasonable should be read to mean that a decision is reasonable

if a reasonable person *could have* reached a similar decision, given the evidence before him, not that a reasonable person *would have* reached that decision." *Midgett v. Washington Group Intern. Long Term Disability Plan*, 561 F.3d 887, 897 (8th Cir. 2009) (quoting *Jackson v. Metro. Life Ins. Co.*, 303 F.3d 884, 887 (8th Cir. 2002) (emphasis added)). In making its evaluation, the Court does not substitute its own weighing of evidence for that of the decision maker. *Cash*, 107 F.3d at 641. Any reasonable decision will stand, even if the Court would interpret the language of the plan differently as an original matter. *Manning v. American Republic Ins. Co.*, 604 F.3d 1030, 1038 (8th Cir. 2010). Finally, in determining whether a denial of benefits was arbitrary or capricious, the Court's review, generally, is limited to the evidence that was before the decision maker. *See Collins v. Central States, Southeast and Southwest Areas Health and Welfare Fund*, 18 F.3d 556, 560 (8th Cir. 1994) (internal citation omitted) ("In deciding whether the Trustees' denial of benefits was arbitrary or capricious, we limit our review to the evidence that was before the Trustees."); *Cash*, 107 F.3d at 641 (internal citation omitted) ("Moreover, review under the deferential standard [of abuse of discretion] is limited 'to evidence that was before' the Committee.").

The five factors outlined in *Finley v. Special Agents Mut. Benefit Ass'n*, 957 F.2d 617, 621 (8th Cir. 1992), guide the Court in determining the reasonableness of a plan administrator's interpretation of a plan. *Manning*, 604 F.3d at 1041. These factors are: (1) whether the interpretation conflicts with ERISA's substantive or procedural requirements; (2) whether the interpretation is consistent with the goals of the Plan; (3) whether the administrator's interpretation is contrary to the clear language of the Plan; (4) whether the interpretation renders any language in the Plan meaningless or internally inconsistent; and (5) whether the administrator has consistently followed the interpretation. *Id.* at 1041-42. However, the

dispositive principle remains: where plan administrators have offered a reasonable interpretation of disputed plan provisions, courts may not replace it with an interpretation of their own, and therefore cannot disturb, as an abuse of discretion, the challenged benefits determination. *Id.* at 1042 (quoting *Darvell v. Life Ins. Co. of North America*, 597 F.3d 929, 935 (8th Cir. 2010).

It is undisputed the language of the Plan is discretionary [ECF Nos. 52 at 2; 55 at 1-2; 53 at ¶ 8; 63 at ¶ 8], and Plaintiff does not dispute "that the arbitrary and capricious standard of review applies to the Court's review of this claim" [ECF Nos. 52 at 2; 61 at 1]. Further, because it is undisputed the relevant buy-up benefits are subject to the Plan's Pre-Existing Condition Exclusion, this Court need only decide whether it was an abuse of discretion for Sedgwick to determine Plaintiff's disability was "caused by, contributed to [by], or result[ed] from a Pre-existing Condition that was in existence within three (3) months before [Plaintiff's] effective date of coverage" [ECF No. 30 at 96].

Both parties have filed a Motion for Summary Judgment [ECF Nos. 52 and 54]. Plaintiff argues the denial of buy-up benefits was an abuse of discretion, while Defendant argues the decision was reasonable. The Court will address the two Motions separately.

## A.    *Plaintiff's Motion for Summary Judgment*

Plaintiff argues the denial of buy-up benefits was an abuse of discretion for three reasons.

### 1.    **Records from Look-Back Period**

First, Plaintiff argues Sedgwick's failure to obtain medical records for a particular time period "is evidence of an arbitrary and capricious denial of benefits" [ECF No. 52 at 3]. Specifically, Plaintiff emphasizes Sedgwick's failure to "obtain any of the Plaintiff's medical records for the narrow window of time specified by the Pre-Existing Condition Exclusion: the three-month period preceding the effective date of the buy-up coverage, October 1, 2011[,] to

December 31, 2011" (the "look-back period") [ECF No. 52 at 2]. Claiming whether a particular condition existed before the look-back period is irrelevant, Plaintiff asserts Sedgwick "relied on vague and general references to the Plaintiff's prior jaw treatment and referenced treatment dates that were remote in time to the Look Back Period," rather than focusing on the look-back period itself [ECF No. 52 at 2-3]. In response, Defendant explains "pre-existing condition" is defined broadly as an "Injury or Sickness or related Injury or Sickness that was in existence within the three-month" look-back period [ECF Nos. 30 at 17; 62 at 2]. Under that definition, Defendant argues, "[t]he condition need only be in existence during the three-month period before the effective date of coverage. The language does not require that Plaintiff seek medical treatment for the condition during this period" [ECF No. 62 at 2].

The Court agrees with Defendant. Medical records from the months and years prior to the three-month look-back period can aid Sedgwick in identifying: (1) the condition causing or contributing to Plaintiff's current disability; and (2) whether that condition also existed during the look-back period. Further, no provision in the Plan requires a pre-existing condition to have been treated during the look-back period. Thus, there is no reason to believe Sedgwick was required to obtain medical records from the look-back period. Therefore, Plaintiff's Motion will be denied on this ground.

### 2. Motor Vehicle Accident

Second, Plaintiff argues the "evidence of record" demonstrates her "disability was not caused by or contributed to by her prior jaw issues" [ECF No. 52 at 3]. Rather, Plaintiff argues her injuries were caused by the September 2012 motor vehicle accident, "which caused . . .

Plaintiff to develop a chronic pain condition, reflex sympathetic dystrophy (RSD)"[8] [ECF No. 52 at 3].  Additionally, Plaintiff argues the car accident also caused the following issues:

> . . . insertion of a permanent orthotic and temporomandibular arthrocentesis of the right temporomandibular joint; a whiplash injury requiring chiropractic treatment; damage to the jaw, including internal derangement of the temporomandibular joints, requiring Dr. Piper to perform a seven-hour reconstructive jaw surgery; sympathetic nerve dysfunction on the right side of the Plaintiff's face, diagnosed as RSD requiring nerve blocks; severe pain necessitating high dose medications, injections, and physical therapy.

[ECF No. 52 at 3].[9]  Plaintiff further states there is no evidence her pre-accident TMJ issues ever caused her to be disabled, claiming the jaw injuries caused by the car accident are new and distinct from prior jaw issues.  Pointing to her "primary disabling diagnosis" of RSD, Plaintiff concludes, "All evidence of record is indicative that the RSD was the result of the car accident, and there is no evidence that the Plaintiff's RSD existed during the look-back period" [ECF No. 52 at 3].

Defendant responds with three arguments.  First, Defendant argues Plaintiff's conclusion that her car accident caused her disability is not supported by the Administrative Record, claiming none of her treating physicians have made this conclusion.  Second, Defendant states, "[E]ven if Plaintiff's accident contributed to her pain, this does not mean that her TMJ did not also contribute to her Disability.  Indeed, the Administrative Record shows that Plaintiff had a long history of TMJ and was experiencing severe pain the month before her accident" [ECF No.

---

[8] As Defendant points out, according to Plaintiff's Statement of Facts, Dr. Piper did not list RSD as the "primary diagnosis affecting job duties" until after the initial denial of Plaintiff's claim for buy-up benefits [*See* ECF No. 37 at 86], and two of Dr. Piper's reports identifying RSD as the disabling condition were prepared after the denial of Plaintiff's appeal [ECF Nos. 39 at 34; 43 at 14; *see also* Nos. 62 at 4; 53 at ¶¶ 32, 42, and 48].  However, based on the Court's review of the Administrative Record, RSD seems to have been first brought up during Plaintiff's visit to Dr. Piper in January 2013 (described at that time as Complex Regional Pain Syndrome, or "CRPS") [ECF No. 35 at 17].

[9] Plaintiff provides no citations to the Administrative Record in support of her argument that these medical issues were caused by the car accident.

62 at 3]. Finally, Defendant emphasizes the aspect of the Plan where disabilities are determined as of the last day an individual is actively at work, which (for Plaintiff) was November 1, 2012, long before any diagnosis of RSD.[10]

Again, the Court is unpersuaded by Plaintiff's argument. Although Plaintiff claims her disability is unrelated to pre-accident jaw issues, her alternative explanation lacks support from the Administrative Record. Plaintiff fails to include citations to medical records in the Administrative Record supporting her argument that the car accident led to her surgery, the diagnosis of RSD, her other medical issues, and, ultimately, her disability. After reviewing the Administrative Record, the Court found various references to RSD in the medical records, but was unable to find any direct support for Plaintiff's claims about the connection between the car accident and RSD. Whether or not the car accident *actually* resulted in surgery and further medical complications, there is a significant lack of evidence in the Administrative Record supporting Plaintiff's argument about the car accident as an alternative cause of her disability, and this lack of evidence speaks to the reasonability of Sedgwick's decision. Further, even if this Court found Plaintiff's argument (regarding the car accident) to be a reasonable conclusion, the arbitrary and capricious standard does not allow the Court to disturb Sedgwick's decision merely because "a different reasonable interpretation could have been made," assuming the actual

---

[10] At this point, the Court acknowledges the extent to which this case contains disputes of fact, especially relating to the parties' disagreement over the actual cause of Plaintiff's surgery and disability. However, these disputed facts are not *material* to this lawsuit. This Court is not tasked with determining whether Plaintiff's car accident actually required surgery or caused the listed issues. Rather, the Court's task is to evaluate the reasonableness of Sedgwick's decision to deny buy-up benefits. The parties may disagree on how to interpret the Administrative Record, as well as the underlying facts leading to Plaintiff's claim and the production of the relevant medical records. However, as indicated in Part I, the parties do agree on the material aspects of what the Administrative Record states, and for the purpose of this Court's review of Sedgwick's decision, this agreement by the parties constitutes the necessary undisputed fact(s). Because the parties agree on what records were before the decision maker, this Court can rule on a Motion for Summary Judgment as to the reasonableness of that decision.

decision is supported by a reasonable explanation.  *Schatz*, 220 F.3d at 949 (internal citation omitted).[11]  With this in mind, Plaintiff's Motion is denied on this second ground.

### 3.    Interpretation of the Administrative Record

Finally, Plaintiff argues Sedgwick "engaged in a self-serving interpretation of the Administrative Record in an effort to deny benefits" [ECF No. 52 at 4].  In particular, Plaintiff believes Sedgwick misinterpreted the following statement made by Dr. Blankenship: "I explained to her that it has taken time to get to the point where she is today and it may take time for healing" [ECF No. 33 at 42].  Plaintiff states Sedgwick took this to mean it had taken time for Plaintiff's jaw condition to deteriorate to that point in time, but Plaintiff argues a "reading of the Administrative Record . . . evidences that Dr. Blankenship was clearly stating the exact opposite. . . . Dr. Blankenship was, therefore, clearly not stating that the Plaintiff's condition had deteriorated over time, but rather, that it would take time for the Plaintiff to heal" [ECF No. 52 at 4-5].  Plaintiff concludes Sedgwick's "denial of buy-up benefits based on an egregious misinterpretation of the Administrative Record is evidence of an abuse of discretion, and an arbitrary and capricious denial of benefits" [ECF No. 52 at 5].  In response, Defendant argues Plaintiff has misunderstood the standard of review, stating, "Although it may be reasonable to interpret the statement as plaintiff does, this does not mean Sedgwick's interpretation is unreasonable" [ECF No. 62 at 4].  Defendant adds, "Because Sedgwick offered many other examples that show Plaintiff's TMJ was a Pre-Existing Condition, a reasonable person could have reached the same decision" [ECF No. 62 at 4].

Once again, the Court cannot agree with Plaintiff's assessment.  Dr. Blankenship's statement is ambiguous, and although Plaintiff provides an alternative interpretation to the

---

[11] As will be made clear in Section B., *infra*, the Court believes Sedgwick's decision is supported by a reasonable explanation.

statement, she provides no real support in arguing Sedgwick's interpretation was an abuse of discretion. Without citing to the Administrative Record, Plaintiff simply asserts a reading of the record "clearly" shows Dr. Blankenship meant the exact opposite of what Sedgwick understood the statement to mean. However, the Court has reviewed the Administrative Record and disagrees with Plaintiff's conclusion the doctor was *clearly* talking about healing (rather than deterioration). Neither interpretation is *clearly* correct. Further, even if Plaintiff had shown Sedgwick's interpretation to, in fact, be a misinterpretation, Plaintiff fails to establish how such a misinterpretation would be *unreasonable*. Therefore, Plaintiff's Motion is denied on this third and final ground.

### B. *Defendant's Motion for Summary Judgment*

Defendant actually spends much of his Motion attempting to point out flaws in arguments made by Plaintiff. However, for its central argument, Defendant states, "[I]t is clear that Plaintiff's TMJ was a Pre-Existing Condition under the Plan, and her Disability is caused by, contributed to by, or results from her TMJ" [ECF No. 55 at 7].[12] For the reasons stated *infra*, the Court will grant Defendant's Motion for Summary Judgment. The Court will first address the dispositive aspects of Plaintiff's medical records in light of the relevant terms of the Plan. Then, the Court will analyze Sedgwick's decision under the aforementioned *Finley* factors.

### 1. Administrative Record Evidence

As a reminder, the "Pre-Existing Condition Exclusion" is described as follows:

> The plan does not provide benefits for any disability that is caused by, contributed to, or results from a Pre-existing Condition that was in existence within three (3) months before your effective date of coverage. The Pre-existing Condition Exclusion will not apply after you perform the Material Duties of your regular

---

[12] The entirety of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment [ECF No. 61] has already been discussed in Note 1, *supra*. The Response is lacking in substance such that no further mention of it is required in the discussion of Defendant's Motion.

occupation for at least twelve (12) months following your effective date of coverage.
If your Optional Benefit amount increases based on a change in elections, after initial eligibility the additional amount will be subject to the Pre-existing Condition Exclusion at the time the change in coverage becomes effective.

[ECF No. 30 at 96-97]. Further, the Plan defines "Pre-Existing Condition" as "an Injury or Sickness or any related Injury or Sickness that was in existence within the three-month period ending on the day immediately before the date the Participant becomes covered under this Plan or the date any increased Benefit amount option becomes effective" [ECF No. 30 at 17]. Additionally, buy-up benefits under the Plan are subject to the Plan's Pre-Existing Condition Exclusion, and a Plan Participant is subject to the Plan's Pre-Existing Condition Exclusion if the Participant becomes disabled within twelve months of the effective date of coverage [ECF No. 30 at 35]. A "determination as to whether a Participant is eligible for a long-term Disability Benefit shall be made as of the last day the Participant was Actively at Work" [ECF No. 30 at 30].

Various entries in the Administrative Record support a conclusion that: (1) Plaintiff's disability was caused by, contributed to by, or resulted from TMJ; and (2) Plaintiff's TMJ was a pre-existing condition in existence within three months before Plaintiff's effective date of coverage. These supporting facts include, but are not limited to, the following:

- The effective date of coverage for Plaintiff's buy-up benefits was January 1, 2012 [ECF No. 37 at 77]. Plaintiff stopped working (and became disabled) on November 1, 2012 [ECF No. 37 at 77].[13]

- In his attending physician statement, prepared in reference to Plaintiff's visits during October and November 2012, Dr. Blankenship stated his "objective findings" as follows: "She has a TMJ disorder with severe symptoms" [ECF No. 31 at 45].

- On November 14, 2012, Plaintiff was evaluated by a neurologist for constant burning ear pain with migration into the shoulders, arms, and fingers [ECF No. 35 at 20].

---

[13] This was within twelve months of January 1, 2012.

- In January 2013, Dr. Piper noted the following medical history:

  > [Plaintiff] had orthodontic appliances from 1996 to 1999, and thereafter wore a night guard for *temporomandibular joint problems* between 2000 and 2010; on August 28, 2012, she experienced severe right-sided headaches with sharp ear pain, ear fullness, pressure, disequilibrium, and blurring in the right eye; by September 2, 2012, she noted an increase in symptoms; because her pain was becoming debilitating she went to the emergency room, where she was diagnosed with Eustachian tube dysfunction; on September 14, 2012, she was involved in a motor vehicle rear end collision; she was referred to a neurologist, and diagnosed with migraine headaches; she was fitted with an occlusal guard and prescribed medication for Eustachian tube dysfunction; by October 25, 2012, she was getting severe ear pain, which was debilitating and made it *impossible for her to work*; she then consulted with a neuro-otologist, who did hearing testing and advised that the *symptoms were caused by a temporomandibular joint problem*;[14] the Plaintiff subsequently underwent insertion of a permanent orthotic and temporomandibular arthrocentesis of the right temporomandibular joint, which gave her two days of relief.

  [ECF No. 53 at ¶ 19 (emphasis added); *see also* No. 35 at 19]. Plaintiff's chief complaint for her January 2013 visit to Dr. Piper was deep burning and aching pain in the right facial area [ECF No. 35 at 19]. At the same visit, Plaintiff told Dr. Piper, "I have *severe temporomandibular joint*. I clench most of the time and clench and grind at night. My left back teeth do not touch without the orthotic. I have malocclusion and medial displaced right temporomandibular joint disc, muscle edema, and trace joint effusion" [ECF No. 35 at 20 (emphasis added)]. Subsequently, Dr. Piper obtained a new MRI scan, which verified both discs were medially dislocated, and Dr. Piper diagnosed internal derangement of the temporomandibular joints [ECF No. 35 at 16]. Dr. Piper noted surgery could be considered as an option, concluding Plaintiff "has painful damage to her temporomandibular joints" and "has a *long[-]standing problem in her temporomandibular joints, which may well predate her childhood orthodontic management*" [ECF No. 35 at 28 (emphasis added)].

- On February 6, 2013, after Dr. Piper recommended Plaintiff undergo bilateral temporomandibular joint fat graft surgery and discectomy, Dr. Piper performed on Plaintiff a bilateral temporomandibular joint microscopic arthroplasty with discectomy and placement of autologous fat graft [ECF No. 35 at 32].

Having considered these references to the Administrative Record, the Court finds

---

[14] Dr. Piper's exact phrasing on this point was as follows: "It was advised that this absolutely was a temporomandibular joint problem" [ECF No. 35 at 19]. Plaintiff's ear, nose, and throat doctor came to the same conclusion [*See* ECF No. 33 at 42].

Sedgwick's decision to deny buy-up benefits was not arbitrary and capricious. Based on the medical records referenced above, it was reasonable for Sedgwick to determine Plaintiff's symptoms (as chronicled by her doctors and specifically starting in August 2012) and, as a result, her disability were related to or involved Plaintiff's TMJ.[15] Similarly, given Plaintiff's long-standing history with TMJ and the multitude of more recent temporomandibular joint problems documented here, it was reasonable for Sedgwick to determine Plaintiff's TMJ was in existence during the three months prior to January 1, 2012, which was the effective date of coverage for her buy-up benefits. Even if different conclusions (e.g., those proffered by Plaintiff) would have been reasonable, Sedgwick's decision to deny buy-up benefits was also reasonable.

In sum, Sedgwick reasonably concluded Plaintiff's TMJ was a pre-existing condition, in existence within three months before the effective date of coverage for her buy-up benefits, which caused, contributed to, or resulted in Plaintiff's disability. Therefore, Sedgwick's conclusion, supported by "substantial evidence" and "a reasonable explanation," was not arbitrary and capricious and does not constitute an abuse of discretion. Thus, the decision should not and will not be disturbed.

## 2.    *Finley* Analysis

The Court's conclusions regarding the reasonableness of Sedgwick's determination are supported by the application of the *Finley* test. Again, the *Finely* factors are: (1) whether the interpretation conflicts with ERISA's substantive or procedural requirements; (2) whether the interpretation is consistent with the goals of the Plan; (3) whether the administrator's interpretation is contrary to the clear language of the Plan; (4) whether the interpretation renders

---

[15] Even if Plaintiff claims her current disability is a consequence of her surgery, it would be reasonable to conclude her TMJ contributed to that consequence, since it is reasonable to conclude TMJ contributed to the need for surgery.

any language in the Plan meaningless or internally inconsistent; and (5) whether the administrator has consistently followed the interpretation. *Manning*, 604 F.3d at 1041-42.[16]

First, Segwick's interpretation of the Plan (and the Pre-Existing Condition Exclusion) does not conflict with the requirement of ERISA. The Eighth Circuit has upheld pre-existing condition exclusions under ERISA. *See Cash*, 107 F.3d at 643 (citing *Kirk v. Provident Life & Accident Ins. Co.*, 942 F.2d 504, 506 (8th Cir. 1991)). Nothing presented here convinces the Court this case involves unique circumstances warranting a contrary determination. *Id.* at 643. Second, the Court finds Sedgwick's decision to be consistent with the Plan's goal to "fund long-term disability and related benefits for its Employees and other persons associated with the Plan Sponsor or such Local Organization" [ECF No. 30 at 42; *see also* No. 30 at 11]. Plaintiff has not argued the decision is inconsistent with the goals of the Plan, and the Court finds no such inconsistency. Third, Sedgwick's interpretation is not contrary to the clear language of the Plan. The Plan defines "Pre-Existing Condition" as "an Injury or Sickness or any related Injury or Sickness that was in existence within the three-month period ending on the day immediately before the date the Participant becomes covered under this Plan or the date any increased Benefit amount option becomes effective" [ECF No. 30 at 17]. "Sickness" is defined as "an illness, disease, medical condition[,] or pregnancy" [ECF No. 30 at 18]. Based on the above analysis, the Court finds no reason to believe Sedgwick's finding of TMJ as a pre-existing condition to be inconsistent with the language of the Plan. Fourth, Sedgwick's interpretation does not render any language in the plan meaningless or internally inconsistent. Finally, Plaintiff has submitted no evidence suggesting Sedgwick has not consistently interpreted the relevant terms.

Thus, Sedgwick's denial of buy-up benefits was not unreasonable, not arbitrary and

---

[16] Neither party mentions, discusses, or applies the *Finley* test in their motions or briefs.

capricious, and not an abuse of discretion. Therefore, the Court will grant Defendant's Motion for Summary Judgment.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff Melissa Loeffelholz's Motion for Summary Judgment [ECF No. 52] is **DENIED**.

**IT IS HEREBY ORDERED** that Defendant Ascension Health's Motion for Summary Judgment [ECF No. 54] is **GRANTED**.

Dated this _22nd_ Day of December, 2014.

_E. Richard Webber_
E. RICHARD WEBBER
SENIOR UNITED STATES DISTRICT JUDGE